In re Jory **BERNARD**, Cynthia D. Bernard, Debtors.

Jory **BERNARD**, Cynthia D. Bernard, Plaintiffs,

v.

**INTERNAL REVENUE SERVICE**, Defendant.

Bankruptcy No. 90BK–50223–07.
Adv. No. 90AP–5018.

United States Bankruptcy Court, W.D. Louisiana, Lafayette–Opelousas Division.

July 15, 1991.

---

Ted Hoyt, Lafayette, La., for plaintiffs.

John Bilheimer, Neal Fowler, U.S. Dept. of Justice, Tax Div., Washington, D.C., for defendant.

## MEMORANDUM OPINION

W. DONALD BOE, Jr., Bankruptcy Judge.

### Introduction and Summary

This is an action brought by debtor Jory Bernard challenging assessment against him of approximately $180,000 in penalty tax provided by 26 U.S.C. Secs. 6671–6672. He does not dispute the nondischargeability in bankruptcy of the taxes remaining unpaid if he is in fact liable for them.[1] Amounts paid by him after assessment total $50,837.11. The penalty tax is designed to protect against loss of trust fund income and social security taxes withheld from employee wages. The penalty tax amounts to 100 per cent of the tax loss suffered by the public treasury. Persons are liable for the penalty tax if they are "responsible persons" who willfully fail to collect, or truthfully account for, or pay over such amounts to the Government. Jory has the burden of proof on the responsible person issue. Once found to be a responsible person, Jory also has the burden of proof on the willfulness issues.

Frequently, more than one responsible person is liable for the penalty tax. While liability of each such person is joint and several, the Government can only recoup 100 per cent of its loss. In the present case, the Internal Revenue Service assessed penalty taxes against Jory plus two other officials in a now defunct oilfield service company that used federal withholding taxes as a source of payment for other creditors. Jory Bernard and his father, Joel, were assessed for the quarters ending March 31, 1982; June 30, 1982; December 31, 1982; and March 31, 1983 (here-

---

1. Income taxes due within 3 years of the date of the filing of the bankruptcy petition are nondischargeable. 11 U.S.C. Secs. 523(a)(1)(A), 507(a)(7)(A). Taxes required to be collected and withheld and for which a debtor is liable in whatever capacity are also non-dischargeable. 11 U.S.C. Secs. 523(a)(1)(A), 507(a)(7)(C).

inafter "the tax quarters in controversy"). Exhibit D–7, IRS Certificate of Assessments and Payments. An accountant, Daniel Theriot, was assessed about $144,000.00 for the first two of these quarters. Contrary to the thrust of his testimony at trial, Joel Bernard in 1983 reported that Jory was one of the individuals who authorized or allowed other obligations to be paid during the period that tax liabilities were being accrued. Exhibit D–8, page 2, line 26.

The parties entered into the following pretrial stipulation:

"Prior to the Comptroller of the Company, Mr. Dan Theriot, leaving the employ of the company in July 1982, Mr. Theriot, along with consultation of the President of the company, Mr. Joel Bernard [Jory's father], made all decisions on which debts were to be paid and directing disbursements of the company."

If read literally, this stipulation means that Jory cannot willfully have taken action prior to July 1982 which resulted in nonpayment of tax withholdings. This stipulation does not exclude the possibility that Jory later engaged in a willful failure to pay withholding taxes that accrued either prior to or after July 1982.

The parties have further stipulated that after Theriot's dismissal in July 1982, Joel Bernard directed that no payments to creditors were to be made without his direct approval. Joel did so after being contacted in July 1982 by an IRS revenue officer who also met with employees Nancy Connick and Susan Landry Livingston about unpaid payroll taxes. The IRS officer did not meet with Jory at that time, and Jory contends that he was unaware of the tax arrearage. Neither the stipulations nor the evidence take Jory off the hook.

■ After consideration of the entire record, the court concludes the assertion that Jory was unaware of the tax arrearage cannot be believed. Jory was too close to his father not to know that there were unpaid trust fund taxes. He also was too involved in too many aspects of the company's business not to know that there were unpaid trust fund taxes. The contention that Jory knew only generally that there

was a tax problem—but not a withholding tax problem—further disregards Jory's heavy financial interest in the family business which was his livelihood. Finally, the record rather clearly indicates that Jory was affirmatively apprised of arrearages in trust fund taxes in July 1982. Even if before July 1982 Jory had no control over company disbursements and no knowledge of withholding tax arrearages, the record appears to show that he did afterward, and Jory has not proved otherwise by a preponderance of the evidence. Jory's checkwriting authority placed him a position to pay all back payroll taxes, even those that accrued prior to July 1982, because company revenues were far in excess of what would have been required to pay those taxes. The contention that Jory was disabled from using his checkwriting authority to pay the back withholding taxes by his father's direction that no payments (to anyone) were to be made without his approval is insufficient as a matter of law to exonerate Jory from liability. The law is clear that "following orders" is no defense since a responsible person's first duty is to make the public treasury whole for trust fund taxes, even if this means disregarding the orders of a superior. There is also considerable room for doubt whether the direction Jory's father gave to company personnel that no payments were to be made without his approval was intended to be binding on Jory—partially because his father did not communicate that instruction to Jory. The court concludes that Jory Bernard is liable for all tax quarters in controversy, though the Government cannot collect more than 100 per cent of its loss from all, collectively, who are liable for it. Jory's liability is nondischargeable in bankruptcy.

*Findings of Fact*

Jory Bernard contends that he was not a responsible person and also that he did not willfully fail to pay to the Government taxes due to it from Coppertop Supply Company, a closely held family business. IRS disputes both of these contentions.

Coppertop Supply Company was incorporated in the 1970's. It was an oilfield

equipment supply business which purchased both new equipment and used equipment which was refurbished for its customers. With the downturn in Louisiana's oil economy, Coppertop filed a corporate Chapter 11 petition in April 1983. Its case was converted to Chapter 7 in 1984. Plaintiff's father, Joel Bernard, was one of the founders of Coppertop. Joel has been assessed by IRS for each of the four quarters involved in this controversy. Joel had ultimate control over conduct of the business, which had about 100 employees. He was President, could write checks on the business without a co-signator, and was also a shareholder.[2] However, the court finds control that Joel exercised over the corporation during all of the tax quarters in controversy was loose. Few corporate formalities were observed. No corporate by-laws formally established who had what authority, and there were apparently no formal meetings of directors or shareholders. Joel was frequently absent from the business for weeks at a time, either on company travel or on vacation. He did maintain frequent contact with his personal secretary by phone, but mainly concerning personal matters. Joel was not a "hands-on" manager.

Joel had additional business interests. When questioned about these at trial, he testified that he owned Kildare Tool and Supply Company, which rented equipment to the construction trades. He also testified he had an interest in Sea Crew Catering Company which provided catering services for offshore oil operations. Joel thought he was President of Sea Crew at one time and did not remember how many employees Sea Crew had.

Joel's testimony failed to disclose the full extent of his business interests. Joel also owned Coppertop Marketing and a scrap and salvage company apparently called Machinery Salvage. He also conducted another operation, Kildare Lift Equipment, but this was possibly part of Kildare Tool and Supply.

Joel has six children. Apparently all of them at various times worked at Coppertop. However, during the tax quarters in controversy, the only Bernard children who performed any significant work for Coppertop were Keith, who was then about 28 years old, and Jory, who was about 24 years old. The court finds that Keith was not influential in the conduct of Coppertop's affairs. It is not clear whether Keith even worked for Coppertop during all of the tax quarters in controversy; the evidence suggests that Keith did not work for Coppertop prior to 1983. (Transcript 103). There is also testimony that Keith did not get along well with his father.

Jory, who had worked in the business since his teenage years, was clearly the second-in-command, at least a *de facto* vice president of the company (although not formally appointed as such), and in charge of day-to-day operations. Jory is currently President of Louisiana Safety System, Inc. This company is in the same line of work as Coppertop, and has about the same number of employees (90 to 100).

None of the other Bernard children was involved in the business of Coppertop to the extent Jory was, either during the tax quarters in controversy or before. Jory worked part-time with Coppertop beginning at about age 13. He began to work full time as a roustabout and truck driver at about age 16. When Jory was 18 or 19 years old, he was promoted in 1978 to the "inside", initially in a sales capacity. During all of the tax quarters in controversy, Jory had the power to sign corporate checks including payroll checks, without a co-signator. While Jory denies he was an officer or shareholder of the corporation, the court finds otherwise. The corporation observed very few formalities and had no formal elections of officers. However the bank's signature card and documents signed by Jory's father and other Coppertop employees listed Jory as "Vice President". His father's former personal secretary, Susan Landry Livingston, testified that she saw Coppertop stock certificates

---

**2.** While there is some testimony that Joel owned 100% of the shares of the corporation, the court finds that Joel owned 60% and that his son Jory had a 40% interest.

giving Joel a 60% interest and Jory a 40% interest. The court finds that Jory was clearly the second-in-command at Coppertop, at least a *de facto* vice-president, and a substantial shareholder.

The court finds that no employee of Coppertop (except Joel) had as much authority or power as Jory Bernard. Jory had actual control over the day-to-day affairs of Coppertop during all of the tax quarters in dispute owing to Jory's close relationship with his father, his father's lack of a hands on approach in handling the affairs of Coppertop, and Jory's business or technical acumen gained from working in the business at an early age and some university training in petroleum engineering. During the tax quarters in controversy, Jory was running all company functions except accounting—inside sales, outside sales, shipping, receiving, and the machine shop—in his words, "bringing those areas into one to make a product, get it out on time, price it and then fulfill our customers' needs." (Transcript 169).

The accounting department was headed by Robert Daniel Theriot. Theriot, about 25 years old, became employed by Coppertop in March 1981 as Comptroller. He was not an officer or director of the company, but like Jory, had the authority to write checks without a co-signator. While Theriot wrote most company checks, Jory had at least some control over the checks that would be paid or not paid by the accounting department even before Theriot was dismissed in July 1982. IRS has assessed Theriot about $144,000 in penalty tax for the first two quarters of 1982.

Theriot was responsible for making periodic tax deposits and for preparing and filing the payroll tax returns. Each time a payroll was prepared, checks for trust fund taxes were prepared as part of the payroll routine. But tax deposits were not made beginning about the fourth quarter of 1981. Joel Bernard terminated Theriot's

employment in early July 1982. Right after Theriot was fired, undeposited trust fund checks, some signed and some not signed, were discovered in Theriot's desk. This probably came as no real surprise to Joel. Joel had hired Rodney Savoy, an outside CPA, to perform some accounting services and prepare financial statements in efforts to secure financing from lenders. Savoy reviewed accounting operations while Theriot was still employed. He found that the company was several months behind in preparing monthly financial statements and that the company was behind on its payroll taxes. Savoy also found several thousand dollars in checks that had been written for payroll taxes but which had never been deposited. Theriot did not want to be in a position of issuing worthless checks. (Transcript 16).

There is some testimony (intended to exculpate Jory) that Theriot never prepared financial statements. The record does not support this testimony. The record is unclear as to whether Jory did or did not look at financial statements that were prepared while Theriot was employed at Coppertop. However, the court believes Theriot's testimony that sometime between April and mid-June 1982 he told Jory that taxes were due but were not being met.[3] Theriot told both Joel and Jory that he needed $100,000 for taxes. On another occasion, Jory signed and mailed a $50,000 check to pay past due invoices to a supplier when Theriot refused to sign because the money was needed for taxes. (Transcript 17–20, 37).

Theriot's explanation regarding why trust fund taxes were undeposited and unpaid is that creditors other than the Government were getting paid. Insufficient funds were left over for the Government after these payments. The creditors paid were the "squeaky wheels" who complained about nonpayment, those shipping C.O.D., and employees on the payroll. (Transcript 25–27, 36) Theriot's explanation

---

3. Dan Theriot was not an unbiased witness because of the IRS assessment. But neither was Joel Bernard who, though also the target of an IRS assessment, was clearly trying in testimony to shield his son, Jory. Witness Nancy Theresa Connick had started at Coppertop about the

same year that Jory began to work there full time and is now Jory's chief bookkeeper at Louisiana Safety System, Inc. The most credible witness who was a Coppertop employee was Susan Landry Livingston.

is firmly corroborated by testimony of other witnesses and exhibits in evidence. Coppertop's receipts, even after the business downturn, were far in excess of what would have been needed to pay the trust fund taxes.[4]

*Conclusions of Law*

Under 26 U.S.C. Secs. 3101–3102, employers are required to withhold Social Security and income taxes regularly from their employees' wages. These taxes are collected from the employers quarterly. The money collected by the employers is required to be held in trust by them until the end of the quarter pursuant to 26 U.S.C. Sec. 7501(a). Since the Government has no financial recourse against employees if these taxes are not paid by their employers at the end of each quarter, 26 U.S.C. Sec. 6672 provides for a substitute tax to guard against loss of Government revenues. It imposes a 100% so-called penalty tax for the wilful failure "to collect, truthfully account for, and pay over" these taxes by the "person required" to do so. Any failure either to collect, or to truthfully account for, or to pay over, can lead to imposition of the 100% penalty tax. *Slodov v. United States*, 436 U.S. 238, 248–252, 98 S.Ct. 1778, 1785–88, 56 L.Ed.2d 251 (1978).

■ There may be more than one "person required" to collect, truthfully account for, or pay over. The 100% penalty tax therefore may be assessed against more than one individual. Liability for a violation is joint and several. *U.S. Life Title Ins. Co. v. Harbison*, 784 F.2d 1238, 1243 (5th Cir.1986). The Government's stated policy is to recover only 100 percent of the trust fund taxes. Once the United States is no longer in danger of losing its right to collect 100 percent (because the limitations period in which taxpayers can seek a refund has expired, or for other reasons), liable penalty taxpayers can secure an administrative adjustment from the IRS. *McCray v. United States*, 910 F.2d 1289, 1290–1291 (5th Cir.1990).

■ For liability to arise under 26 U.S.C. Sec. 6672, a person assessed with the penalty must meet two requirements. He must in the jargon of the tax trade be a "responsible person". And he must willfully refuse to pay it. The burden of proof is on the taxpayer as to all issues; the IRS assessment is presumed to be correct unless it can be shown to be without rational foundation. *Ruth v. United States*, 823 F.2d 1091, 1093 (7th Cir.1987); *United States v. Pomponio*, 635 F.2d 293, 296 (4th Cir.1980). *Hornsby v. Internal Revenue Service*, 588 F.2d 952, 953 (5th Cir.1979).

■ The court concludes that Jory Bernard, a shareholder and *de facto* Vice President, was a responsible person during all tax quarters in controversy. Although Jory contends he was never elected as Vice President, a responsible person does not have to be a formally elected officer. Sec. 6671(b) defines the term "person" to *include* an officer or employee. The liability imposed by Sec. 6672 is not restricted to such persons. It even reaches corporations and other artificial entities. *Pacific National Insurance Co. v. United States*, 422 F.2d 26, 30 (9th Cir.), *cert. denied*, 398 U.S. 937, 90 S.Ct. 1838, 26 L.Ed.2d 269 (1970).

That responsible persons do not have to be formally vested with office or even employment in the corporate taxpayer is illustrated in *Commonwealth National Bank of Dallas v. United States*, 665 F.2d 743 (5th Cir.1982). The Court of Appeals held that the bank lending to a corporate employer, the bank's chief executive officer, and the chief executive officer of the corporate employer were each liable for the 100 percent penalty tax. The court noted that its concern was with actual control and economic reality rather than paper facades. The corporation had no funds except from the bank. Since the bank, its chief executive officer, and the chief executive officer of the corporation determined who would be paid, and when, and intentionally neglected to make payment of trust fund taxes, each was a responsible person—that

---

**4.** Exhibit D–3 shows sales of $2,337,014 for the period April 30, 1982 to November 30, 1982. Then Exhibits D–4, D–5, and D–6 show that

Coppertop's bank account was credited with deposits of $743,549 from December 30, 1982 to March 31, 1983.

is, "one who has a final and significant—even not exclusive—word as to which bills or creditors should be paid". *Id.* at 757. The court held that the fact that more than one person fit this description by exercising significant control over the payment of creditors did not absolve others in the same position. *Id.*

Jory's activities and authority match well with all factors that the Fifth Circuit considers in determining on a case-by-case basis who is a responsible person: (1) holding an office or owning stock in a corporation; (2) managing the day-to-day operations of the business; (3) making decisions as to the disbursement of funds and the payment of creditors; and (4) check signing authority. *Turnbull v. United States,* 929 F.2d 173, 178 (5th Cir.1991). If Jory knew of the arrearage in trust fund taxes, he would clearly have some liability under Sec. 6672. *See Neckles v. United States,* 579 F.2d 938 (5th Cir.1978) holding that a non-officer who was regarded by some as "boss", who knew of the delinquency in payment of trust fund taxes, and who continued to pay others through significant but not final control over disbursements, was liable as a responsible party.

Jory had signature authority on the company checking account as "Vice President". He could have written checks to pay company taxes. He admitted that his father would have been displeased if he had done so. His father no doubt would have been extremely displeased. That does not exempt Jory from responsible person status under Sec. 6672. The case-law carefully guards trust fund taxes from use as operational cash. The first duty of the responsible person is not to his employer, or even to himself. *Howard v. United States,* 711 F.2d 729 (5th Cir.1983) held that an individual who was sole signatory on the corporation's main checking account was a responsible person even though the chief executive officer and majority shareholder had ordered him not to pay trust fund taxes. The fact that he might have been fired had he paid the taxes did not make him any less responsible for payment. His actions in failing to insure payment were willful because he wrote checks to other creditors when he knew IRS was not being paid. The 11th Circuit reached a similar result in *Roth v. United States,* 779 F.2d 1567 (11th Cir.1986). The company president told the executive vice-president not to pay trust fund taxes; when he complied, he was held liable for the 100 percent penalty tax. *Roth* reversed a trial court holding that to follow *Howard, supra,* would condone use of corporate money contrary to the president's instructions and be tantamount to embezzlement. *Roth* held that the federal statute imposed a distinct and definite obligation on every responsible person which could not be contravened by a superior's instructions. "Roth once having become an 'otherwise responsible person' to pay over the taxes became obligated by statute to pay these funds to the IRS. He was under no obligations to obey instructions from his corporate supervisor not to do so." *Roth* at 1572.

That Jory Bernard is a responsible person does not in and of itself make him liable for penalty tax. The penalty tax can only be imposed if there is a "willful failure". *Slodov v. United States,* 436 U.S. 238, 254, 98 S.Ct. 1778, 1788, 56 L.Ed.2d 251 (1978). To take an example, a company's comptroller who had been effectively deprived of all power over receipts and disbursements through an agreement between the company's president and an outside financier did not willfully fail to insure that trust fund taxes be paid. *Hochstein v. United States,* 713 F.Supp. 119 (S.D.N.Y.1989). The willfulness requirement is met when a responsible person voluntarily, consciously, and intentionally causes the corporation to pay other creditors while he is aware that such funds are owed to the Government. *Maggy v. United States,* 560 F.2d 1372, 1375 (9th Cir. 1977); *Newsome v. United States,* 431 F.2d 742 (5th Cir.1970). The willfulness requirement is also satisfied where, a responsible person acts with a reckless disregard of a known or obvious risk that trust funds may not be remitted to the Government. *Turnbull v. United States,* 929 F.2d 173, 180 (5th Cir.1991). The burden of proving lack of willfulness is on the taxpayer. *Brown*

*v. United States,* 591 F.2d 1136, 1140 (5th Cir.1979); *Thibodeaux v. United States,* 828 F.2d 1499, 1505 (11th Cir.1987).

█ Counsel for the taxpayer in the present case takes the position that Jory Bernard cannot be liable for the penalty tax because he had no knowledge that withholding taxes were not being paid. This has not been proved. The court accepts Theriot's testimony that he told Jory between April and mid-June 1982 that taxes were due but were not being met. (Transcript 17–20, 37). Jory had a duty to see to it that company funds were used to satisfy the company's withholding tax liability. Jory's obligation extended even to taxes accruing before Jory became aware of them, provided that there were funds that could later be used to pay them. This obligation is illustrated by the facts and ruling in *Mazo v. United States,* 591 F.2d 1151 (5th Cir.1979), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). The general manager of Savannah Inn Country Club knew of arrearages in trust fund tax payments and had check writing authority. Checks on the regular corporate account could also be signed by any two directors. An IRS agent met with each of the directors. They contended they knew nothing about the arrearages prior to the meeting. However, deposits to the corporate checking account made *after* the meeting were not *all* applied to pay the past-due trust fund taxes. The Court of Appeals held that the directors were liable. Once they became aware of the arrearages, they were under a duty to insure that the trust fund taxes were paid before any payments were made to any other creditors.

Because a responsible person has the burden of disproving willfulness, he must prove that no creditors other than the Government were paid after he became aware of the withholding tax problem. *Smith v. United States,* 894 F.2d 1549, 1553–1554 (11th Cir.1990). In the case at bar, however, Jory Bernard takes the position that he had no knowledge of the tax problem. This court rejects that position.

Jory's counsel argues that Jory knew some taxes were due but contends Jory had no knowledge that these taxes were trust fund taxes. The court cannot accept this contention. Jory was the clear second-in-command at Coppertop and had a close relationship with his father, Joel. When the IRS revenue officer met with Joel, Susan Landry Livingston, and Nancy Connick (Jory's present secretary) in July 1982 to discuss the trust fund taxes of this family business, Joel would almost surely have acquired swift knowledge that withholding taxes were due, payable, and in arrears (if he did not already know). His very livelihood depended on Coppertop, a company with which he had grown up. The issue of willfulness is directed to the responsible person's (Jory's) state of mind. Since it is improbable that Jory, a responsible person, did not know that trust fund taxes were due and payable, the court must conclude that he acted willfully. This conclusion is based on more than just inferences. After the IRS revenue officer interviewed Joel, Nancy Connick, and Susan Landry Livingston in July 1982, meetings were then conducted regarding the unpaid payroll taxes *at which Jory was present. See* Exhibit D–2, page 2, item 15b, Report of Interview with Susan Landry, IRS Form 4180, *and* Transcript 124–125.

Jory could have written checks on the corporate account to pay the Government, but did not. He wrote checks to make purchases. He also apparently signed payroll checks after July 1982; *see* Exhibit 2, page 4, item 30a. His failure to utilize his checkwriting authority to make payment of trust fund taxes is willful under *Howard* and *Roth, supra,* since the first duty of a responsible person, even one "acting under orders", is to the Government. Jory is liable for all tax quarters in controversy and that liability is nondischargeable in bankruptcy. IRS cannot, however, recoup more than 100 per cent of its loss, collectively, from all who have been assessed.

A judgment consistent with this opinion will be signed upon presentation by counsel for the parties. The court wishes to compliment both counsel on their briefs, repre-

sentation, and professional demeanor in this proceeding.